**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FORTINET, INC., | No. C 12-02540 JSW |
| Plaintiff, | |
| v. | **CLAIM CONSTRUCTION ORDER** |
| SRI INTERNATIONAL, INC., | |
| Defendant. | No. C 12-03231 JSW |
| CHECK POINT SOFTWARE TECHNOLOGIES, INC., | |
| Plaintiff, | |
| v. | |
| SRI INTERNATIONAL, INC., | |
| Defendant. | |

The Court has been presented with a technology tutorial and briefing leading up to a hearing pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). This Order construes ten claim terms selected by the parties, which appear in the two patents at issue in this case: United States Patent No. 6,711,615 ("the '615 Patent") called "Network Surveillance," and United States Patent No. 6,484,203 ("the '203 Patent") called "Hierarchical Event Monitoring and Analysis."

**BACKGROUND**

Fortinet, Inc. ("Fortinet") and Check Point Software Technologies, Inc. ("Check Point") (collectively, "the Plaintiffs") seek declaratory judgments of invalidity as to both the '615 and the '203 Patents. The Court shall address additional facts as necessary in the remainder of this Order.

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ANALYSIS**

**A.     Legal Standard.**

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water*, *Inc*. *v*. *Safari Water Filtration Sys*., *Inc*., 381 F.3d 1111, 1115 (Fed. Cir. 2004).  The interpretation of the scope and meaning of disputed terms in patent claims is a question of law and exclusively within the province of a court to decide. *Markman*, 517 U.S. at 372.  The inquiry into the meaning of the claim terms is "an objective one." *Innova/Pure Water*, 381 F.3d at 1116.  As a result, when a court construes disputed terms, it "looks to those sources available to the public that show what a person of skill in the art would have understood the disputed claim language to mean." *Id.*  In most cases, a court's analysis will focus on three sources: the claims, the specification, and the prosecution history. *Markman v. Westview Instruments, Inc*., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  However, on occasion, it is appropriate to rely on extrinsic evidence regarding the relevant scientific principles, the meaning of technical terms, and the state of the art at the time at the time the patent issued. *Id.* at 979-81.

The starting point of the claim construction analysis is an examination of the specific claim language.  A court's "claim construction analysis must begin and remain centered on the claim language itself, for that is the language that the patentee has chosen to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." *Innova/Pure Water*, 381 F.3d at 1116 (internal quotations and citations omitted).  Indeed, in the absence of an express intent to impart a novel meaning to a term, an inventor's chosen language is given its ordinary meaning. *York Prods*., *Inc. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1572 (Fed. Cir. 1996).  Thus, "[c]laim language generally carries the ordinary meaning of the words in their normal usage in the field of the invention." *Invitrogen Corp. v. Biocrest Mfg*., *L.P.*, 327 F.3d 1364, 1367 (Fed. Cir. 2003); *see also Renishaw v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (recognizing that "the claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim").  A court's final construction, therefore, must accord with the words chosen by the patentee

**United States District Court**
For the Northern District of California

1    to mete out the boundaries of the claimed invention.

2         The court should also look to intrinsic evidence, including the written description, the

3    drawings, and the prosecution history, if included in the record, to provide context and clarification

4    regarding the intended meaning of the claim terms. *Teleflex*, *Inc. v. Ficosa N. Am. Corp.*, 299 F.3d

5    1313, 1324-25 (Fed. Cir. 2002). The claims do not stand alone. Rather, "they are part of 'a fully

6    integrated written instrument.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en

7    banc) (quoting *Markman*, 52 F.3d at 978). The specification "may act as a sort of dictionary, which

8    explains the invention and may define terms used in the claims." *Markman*, 52 F.3d at 979. The

9    specification also can indicate whether the patentee intended to limit the scope of a claim, despite

10   the use of seemingly broad claim language. *SciMed Life Sys., Inc. v. Advanced Cardiovascular*

11   *Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) (recognizing that when the specification "makes

12   clear that the invention does not include a particular feature, that feature is deemed to be outside the

13   reach of the claims of the patent, even though the language of the claims, read without reference to

14   the specification, might be considered broad enough to encompass the feature in question").

15        Intent to limit the claims can be demonstrated in a number of ways. For example, if the

16   patentee "acted as his own lexicographer," and clearly and precisely "set forth a definition of the

17   disputed claim term in either the specification or prosecution history," a court will defer to that

18   definition. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). In order

19   to so limit the claims, "the patent applicant [must] set out the different meaning in the specification

20   in a manner sufficient to give one of ordinary skill in the art notice of the change from ordinary

21   meaning." *Innova/Pure Water*, 381 F.3d at 1117. In addition, a court will adopt an alternative

22   meaning of a term "if the intrinsic evidence shows that the patentee distinguished that term from

23   prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described

24   a particular embodiment as important to the invention." *CCS Fitness*, 288 F.3d at 1367. For

25   example the presumption of ordinary meaning will give way where the "inventor has disavowed or

26   disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction,

27   representing clear disavowal of claim scope." *Gemstar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352,

28   1364 (Fed. Cir. 2004). Likewise, the specification may be used to resolve ambiguity "where the

1   ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit

2   the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325.

3   However, limitations from the specification (such as from the preferred embodiment) may

4   not be read into the claims, absent the inventor's express intention to the contrary. *Id*. at 1326; *see*

5   *also CCS Fitness*, 288 F.3d at 1366 ("[A] patentee need not 'describe in the specification every

6   conceivable and possible future embodiment of his invention.'") (quoting *Rexnord Corp. v. Laitram*

7   *Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001)).  To protect against this result, a court's focus should

8   remain on understanding how a person of ordinary skill in the art would understand the claim

9   terms. *Phillips*, 415 F.3d at 1323.

10   If the analysis of the intrinsic evidence fails to resolve any ambiguity in the claim language,

11   a court then may turn to extrinsic evidence, such as expert declarations and testimony from the

12   inventors. *Intel Corp. v. VIA Techs.*, *Inc*., 319 F.3d 1357, 1367 (Fed. Cir. 2003) ("When an

13   analysis of *intrinsic* evidence resolves any ambiguity in a disputed claim term, it is improper to rely

14   on extrinsic evidence to contradict the meaning so ascertained.") (emphasis in original).  When

15   considering extrinsic evidence, a court should take care not to use it to vary or contradict the claim

16   terms.  Rather, extrinsic evidence is relied upon more appropriately to assist in determining the

17   meaning or scope of technical terms in the claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d

18   1576, 1583-84 (Fed. Cir. 1996).

19   Dictionaries also may play a role in the determination of the ordinary and customary

20   meaning of a claim term.  In *Phillips*, the Federal Circuit reiterated that "[d]ictionaries or

21   comparable sources are often useful to assist in understanding the commonly understood meanings

22   of words . . . ." *Phillips*, 415 F.3d at 1322.  The *Phillips* court, however, also admonished that

23   district courts should be careful not to allow dictionary definitions to supplant the inventor's

24   understanding of the claimed subject matter.  "The main problem with elevating the dictionary to . .

25   . prominence is that it focuses the inquiry on the abstract meaning of the words rather than on the

26   meaning of claim terms within in the context of the patent." *Id*. at 1321.  Accordingly, dictionaries

27   necessarily must play a role subordinate to the intrinsic evidence.

28   In addition, a court has the discretion to rely upon prior art, whether or not cited in the

4

1   specification or the file history, but only when the meaning of the disputed terms cannot be

2   ascertained from a careful reading of the public record. *Vitronics*, 90 F.3d at 1584.  Referring to

3   prior art may make it unnecessary to rely upon expert testimony, because prior art may be

4   indicative of what those skilled in the art generally understood certain terms to mean. *Id.*

5   **B.      Claim Construction.**

6          **1.      "Network monitors"/"the monitors"**

7          The term "network monitors appears in Claims 1, 4, 6, 13, 16, and 18 of the '615 Patent, and

8   Claims 1, 4, 6, 12, 15, and 17 of the '203 Patent.  The term "the monitors" appears in Claim 1 of

9   both the '615 and the '203 Patents.  The parties agree that "the monitors" refers to "network

10  monitors."

11         Defendant SRI International, Inc. ("SRI") argues that the term "network monitors" must be

12  construed to mean "software and/or hardware that can collect, analyze and/or respond to data."

13  (Parties' Final Joint Claim Construction Statement ("Statement") at App. A.).  The Plaintiffs, on the

14  other hand, argue that the term must be construed to mean "software and/or hardware that can detect

15  suspicious activity by analyzing network traffic data."  (*Id.*)  During oral argument in the *Markman*

16  proceeding, Check Point proposed a compromise whereby the Court would accept SRI's

17  construction but replace the second "and/or" with "and" and "data" with "network traffic data."

18         The key dispute between the parties is whether all "network monitors" must be capable of

19  detecting suspicious activity through the analysis of network traffic data.  SRI argues that the

20  construction the Plaintiffs advance would improperly require hierarchical monitors to include this

21  capability.  The patents-in-suit require a hierarchical system of network monitors to perform a

22  variety of tasks related to network security.  As part of the hierarchy, low level monitors may detect

23  suspicious activity, and then report the results to domain or enterprise monitors that may receive and

24  integrate those reports. *See, e.g.*, '203 Patent at 2:56-65.  The Plaintiffs' proposed construction

25  therefore improperly limits "network monitors" to a single type of activity, thereby excluding

26  domain and enterprise monitors from the definition.  SRI's patents describe several levels of

27  network monitors, performing a range of tasks. *See, e.g.*, '203 Patent at 3:12-4:04.  The Court finds

28  that it would be improper to limit the definition of "network monitors" in the manner the Plaintiffs

*United States District Court*
*For the Northern District of California*

5

1  propose.

2       Accordingly, the Court construes the term "network monitors" to mean: "software and/or

3  hardware that can collect, analyze and/or respond to data."

4       **2.       "Suspicious network activity"**

5       The term "suspicious network activity" appears in Claims 1 and 13 of the '615 Patent, and

6  Claims 1 and 12 of the '203 Patent.

7       SRI argues that the term "suspicious network activity" must be construed to mean "activity

8  that indicates a known or possible malicious attack on the network." (Statement at App. A.)  The

9  Plaintiffs, on the other hand, argue that the term must be construed to mean "network traffic with

10 attributes of a suspected, but unconfirmed, intrusion." (*Id.*)

11      The key areas of dispute between the parties are: (1) whether "suspicious network activity"

12 can encompass known attacks; and (2) whether "network activity" is synonymous with "network

13 traffic."  The Patents' specifications draw a distinction between suspicious and malicious activity.

14 *See* '203 Patent at 7:11-13.  As part of the analysis of such activity, the monitors create both

15 suspicion reports and intrusion reports. *Id.* at 7:37-48.  A person of ordinary skill in the art, reading

16 the claim language in light of the context of the Patents as a whole, would understand that the

17 patentee intended "suspicious" and "malicious" to have distinct meanings. *See Rambus Inc. v.*

18 *Hynix Semiconductor Inc.*, 569 F. Supp. 2d 946, 968 (N.D. Cal. 2008) (quoting *Phillips*, 415 F.3d at

19 1312-13); *see also* '203 Patent at 7:11-13 ("Signature engine 24 can also examine the data portion of

20 packets in search of a variety of transactions that indicate suspicious, if not malicious, intentions by

21 an external client.").  "Malicious" activity is activity known to present a threat, therefore

22 "suspicious" activity should be construed to refer to unconfirmed threats.

23      However, the Court is convinced by SRI's contentions at oral argument that "network

24 activity" is not synonymous with "network traffic."  Network activity includes network traffic, but

25 can also include "pings" and failed logon attempts. *See* '203 Patent at 7:6-10.  That is, "network

26 activity" can also include activity undertaken by a foreign user, not simply traffic that actually

27 enters the network.  Thus, network activity encompasses network traffic, but also has a broader

28 application.

**United States District Court**
For the Northern District of California

1    Accordingly, the Court construes "suspicious network activity" to mean: "network activity

2   with attributes of a suspected, but unconfirmed, intrusion."

3    **3.      "Automatically receiving and integrating"**

4    The term "automatically receiving and integrating" appears in Claim 1 of both the '615 and

5   the '203 Patents.

6    SRI argues that the term "automatically receiving and integrating" must be construed to

7   mean "without user intervention, receiving reports of suspicious activity and combining those

8   reports into a different end product; i.e., something more than simply collecting and reiterating

9   data." (Statement at App. A.)  The Plaintiffs, on the other hand, argue that the term must be

10  construed to mean "without user intervention, receiving reports of suspicious activity and combining

11  those reports into a different end product (i.e., something more than simply collecting and reiterating

12  data) for purposes of detecting a suspected attack or threat."  (*Id.*)

13   The key dispute between the parties is whether detecting a suspected attack or threat is the

14  sole purpose of "automatically receiving and integrating."  At oral argument in the *Markman*

15  hearing, Fortinet suggested adding the words "at least" to further define the purpose of

16  "automatically receiving and integrating."  This proposed addition does not solve the problem

17  because "at least" still limits the purpose of "automatically receiving and integrating" solely to

18  detecting a suspected attack or threat.

19   However, "claims must be read in view of the specification, of which they are a part."

20  *Phillips*, 415 F.3d at 1315 (citation and internal quotation marks omitted).  The very purpose of the

21  patents-in-suit is to detect network intrusions.  Therefore, it is reasonable to include reference to the

22  purpose of the invention when construing a disputed claim term.  *See id.*

23   Accordingly, the Court construes the term "automatically receiving and integrating" to mean:

24  "without user intervention, receiving reports of suspicious activity and combining those reports into

25  a different end product (i.e., something more than simply collecting and reiterating data) including

26  for purposes of detecting a suspected attack or threat."

27    **4.      [hierarchical monitors] "adapted to automatically receive and integrate"**

28    The term [hierarchical monitors] "adapted to automatically receive and integrate" appears in

**United States District Court**
For the Northern District of California

7

**United States District Court**
For the Northern District of California

1  Claim 13 of the '615 Patent and Claim 12 of the '203 Patent.

2      SRI argues that the term [hierarchical monitors] "adapted to automatically receive and

3  integrate" must be construed to mean "capable of receiving reports of suspicious activity and,

4  without user intervention, combining those reports into a different end product; i.e., something more

5  than simply collecting and reiterating data." (Statement at App. A.)  The Plaintiffs, on the other

6  hand, argue that the term "adapted to" does not be construed, and the remainder of the term must be

7  construed to mean "without user intervention, receiving reports of suspicious activity and combining

8  those reports into a different end product (i.e., something more than simply collecting and reiterating

9  data) for purposes of detecting a suspected attack or threat." (*Id.*)

10     The key dispute between the parties is whether "adapted to" should be construed as

11  synonymous with "capable of."  In common parlance,"adapted to" is most commonly defined more

12  narrowly than "capable of." *See, e.g.*, *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d

13  1335, 1349 (Fed. Cir. 2012); *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. C 10-3428

14  PSG, 2013 WL 831528, at *10-11 (N.D. Cal. Jan. 10, 2013).  When determining what meaning the

15  patentee here assigned to "adapted to," the Court must look at the patent as a whole. *See Aspex*

16  *Eyewear*, 672 F.3d at 1349.  Here, the patentee chose to describe the claimed invention using past or

17  present tense language. *See* '615 Patent at Claim 13 (claiming "a plurality of network monitors

18  deployed . . . the hierarchical monitors adapted to automatically receive and integrate"); '203 Patent

19  at Claim 12 (same).  The language the patentee chose does not reflect mere capability, but instead,

20  the claimed invention does not exist until the network monitors have been deployed and are adapted

21  to automatically receive and integrate.  Thus, within the context of these Patents, "adapted to"

22  should be construed more narrowly than "capable of." *See Aspex Eyewear*, 672 F.3d at 1349.

23     Accordingly, the Court construes the term [hierarchical monitors] "adapted to automatically

24  receive and integrate" to mean: "without user intervention, receiving reports of suspicious activity

25  and combining those reports into a different end product (i.e., something more than simply

26  collecting and reiterating data) including for purposes of detecting a suspected attack or threat."

27  //

28  //

8

United States District Court
For the Northern District of California

**5.    "Detecting, by the network monitors, suspicious activity based on analysis of network traffic data"**

The term "detecting, by the network monitors, suspicious activity based on analysis of network traffic data" appears in Claim 1 of both the '615 and '203 Patents.

SRI argues that the term "detecting, by the network monitors, suspicious activity based on analysis of network traffic data" must be construed to mean "detecting based on an analysis of data derived from or describing network packets and excluding analysis that is limited solely to host operating system audit logs." (Statement at App. A.)  The Plaintiffs, on the other hand, argue that the term must be construed to mean "detecting, by the network monitors, suspicious network activity based on direct examination of network packets." (*Id.*)

The key dispute between the parties is whether "detecting" requires direct examination of data.  When the patents-in-suit underwent reexamination, SRI asserted repeatedly that "analysis of network traffic data" requires direct examination of network packets.  (*See, e.g.*, Declaration of Stefani E. Shanberg in Support of Plaintiff Check Point Software Technologies, Inc.'s Responsive Claim Construction Brief ("Shanberg Decl.") Ex. I at 7; Ex. J at 5.)  "[P]rosecution history can be invaluable for demonstrating the inventor's understanding of the claims and checking 'whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.'" *Rambus*, 569 F. Supp. 2d at 969 (quoting *Phillips*, 415 F.3d at 1317.).  SRI's prosecution history unambiguously demonstrates that it intended to limit analysis of network traffic data to direct examination of network packets.  (*See, e.g.*, Shanberg Decl. Ex. I at 7, 13; Ex. J at 5, 7, 11.)

Accordingly, the Court construes "detecting, by the network monitors, suspicious activity based on analysis of network traffic data" to mean: "detecting, by the network monitors, suspicious network activity based on direct examination of network packets."

**6.    "Said plurality of network monitors detecting suspicious network activity based on analysis of network traffic data"**

The term "said plurality of network monitors detecting suspicious network activity based on analysis of network traffic data" appears in Claim 13 of the '615 Patent and Claim 12 of the '203

9

1   Patent.

2          SRI argues that the term "said plurality of network monitors detecting suspicious network

3   activity based on analysis of network traffic data" must be construed to mean "capable of detecting

4   based on an analysis of data derived from or describing network packets and excluding analysis that

5   is limited solely to host operating system audit logs." (Statement at App. A.)  The Plaintiffs, on the

6   other hand, argue that the term must be construed to mean "said plurality of network monitors

7   detecting suspicious network activity based on direct examination of network packets."  (*Id.*)

8          The key disputes between the parties are the same as those discussed in Claim terms 4 and 5;

9   that is, whether the network monitors must be actively detecting suspicious network activity, or

10  merely capable of performing that function, and whether "detecting" requires direct examination.

11  For the same reasons discussed *supra*, the Court is persuaded that the claimed invention requires

12  active detecting – not merely the capability to detect – and that such detecting requires direct

13  examination of network packets.

14         Accordingly, the Court construes the term "said plurality of network monitors detecting

15  suspicious network activity based on analysis of network traffic data" to mean: "said plurality of

16  network monitors detecting suspicious network activity based on direct examination of network

17  packets."

18         **7.        "Network monitors deployed"/"network monitors are deployed"**

19         The terms "network monitors deployed"/"network monitors are deployed" appears in Claims

20  13 and 18 of the '615 Patent, and Claims 12 and 17 of the '203 Patent.

21         SRI argues that the terms "network monitors deployed"/"network monitors are deployed"

22  must be construed to mean "network monitors that can be configured and/or installed." (Statement

23  at App. A.)  The Plaintiffs, on the other hand, note that the parties agree that "deploying a plurality

24  of network monitors" means "configuring and/or installing two or more network monitors," and that

25  "software is configured and hardware is installed." (*Id.*)  The Plaintiffs contend that this claim term

26  does not require additional construction, but argue that if the Court construes the term, it must be

27  construed to mean "network monitors that are configured and/or installed" and that "software is

28  configured and hardware is installed." (*Id.*)

**United States District Court**
For the Northern District of California

1    The key dispute between the parties is the same issue regarding active language discussed

2 *supra* in Claim terms 4 and 6.

3    Accordingly, the Court construes the terms "network monitors deployed"/"network monitors

4 are deployed" to mean: "network monitors that are configured and/or installed" and "software is

5 configured and hardware is installed."

6    **8.    "Correlating intrusion reports reflecting underlying commonalities"**

7    The term "correlating intrusion reports reflecting underlying commonalities" appears in

8 Claim 2 of both the '615 and the '203 Patents.

9    SRI argues that the term "correlating intrusion reports reflecting underlying commonalities"

10 must be construed to mean "combining the reports to reflect underlying commonalities." (Statement

11 at App. A.) Check Point agrees with SRI's proposed construction. (*Id.* at 2 n.1.) Fortinet, on the

12 other hand, argues that the term either needs no construction, or in the alternative, it must be

13 construed to mean "combining intrusion reports with underlying commonalities to identify more

14 global threats." (*Id.* at App. A.) At oral argument in the *Markman* hearing, Fortinet suggested the

15 alternative construction "combining intrusion reports with underlying commonalities at least to

16 identify threats."

17    The key dispute between SRI and Fortinet is whether the sole purpose of combining the

18 reports is to identify more global threats to the network. This is essentially the same dispute

19 discussed *supra* in Claim term 3.

20    Accordingly, the Court construes the term "correlating intrusion reports reflecting underlying

21 commonalities" to mean: "combining the reports to reflect underlying commonalities, including to

22 identify threats."

23    **9.    "Correlating intrusion reports reflecting underlying commonalities"**

24    The term "correlating intrusion reports reflecting underlying commonalities" appears in

25 Claim 14 of the '615 Patent, and Claim 13 of the '203 Patent.

26    SRI argues that the term "correlating intrusion reports reflecting underlying commonalities"

27 in the context of these Claims must be construed to mean "capable of combining the reports to

28 reflect underlying commonalities." (Statement at App. A.) The Plaintiffs do not believe this term

11

United States District Court
For the Northern District of California

1    needs additional construction but argue that it must be construed consistently with Claim term 8,

2    above.  (*Id.*)

3          The key dispute between the parties is whether integration requires hierarchical monitors to

4    be correlating reports or whether it merely requires that they possess the capability to correlate

5    reports; that is, this is essentially the same issue regarding active language discussed *supra* in Claim

6    terms 4, 6, and 7.  Moreover, the Court is persuaded by the Plaintiffs' argument that this Claim term,

7    which is identical to Claim term 8, should be construed consistently with Claim term 8.

8          Accordingly, the Court construes the term "correlating intrusion reports reflecting underlying

9    commonalities" to mean: "combining the reports to reflect underlying commonalities, including to

10   identify threats."

11         **10.    "Network traffic data"**

12         The term "network traffic data" appears in Claims 1 and 13 of the '615 Patent, and Claims 1

13   and 12 of the '203 Patent.

14         SRI does not believe that this term requires construction.  (Statement at App. A.)  However,

15   should the Court construe the term, SRI argues that the term "network traffic data" must be

16   construed to mean "data derived from or describing network packets."  (*Id.*)  The Plaintiffs, on the

17   other hand, argue that the term must be construed to mean "network traffic data" is comprised of

18   "network packets."  (*Id.*)

19         The key dispute between the parties is whether network traffic data can be equated with

20   network packets.  During reexamination SRI stated that "[a]ccording to its plain meaning, the phrase

21   'network traffic data' refers to data obtained from network traffic, i.e., network packets."  (Shanberg

22   Decl. Ex. J at 5.)  The Court is persuaded that, at the time of reexamination, SRI understood

23   "network traffic data" to be comprised of network packets.  *See Phillips*, 415 F.3d at 1317; *Rambus*,

24   569 F. Supp. 2d at 969.

25         Accordingly, the Court construes the term "network traffic data" to mean: "network traffic

26   data" is comprised of "network packets."

27                              **CONCLUSION**

28         Based on the analysis set forth above, the Court adopts the foregoing constructions of the

                                            12

1   disputed terms.  The parties are ordered to submit a further joint case management report pursuant to

2   Patent Standing Order ¶ 13 by no later than November 8, 2013.

3        **IT IS SO ORDERED.**

4

5   Dated: October 22, 2013



6                                                                  JEFFREY S. WHITE
                                                                   UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

13